```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE NORTHERN DISTRICT OF MISSISSIPPI

 3                         OXFORD DIVISION

 4

 5  LOLITA PENNINGTON, INDIVIDUALLY AND AS

 6  REPRESENTATIVE OF THE ESTATE AND WRONGFUL

 7  DEATH BENEFICIARIES OF ANDRIANA HALL         PLAINTIFFS

 8  V.                       CIVIL ACTION NO. 3:16cv248-NBB-JMV

 9  SHARANJIT PARMAR, PARMAR TRUCKLINES,

10  UPS GROUND FREIGHT, INC. A/K/A

11  UNITED PARCEL SERVICE                        DEFENDANTS

12

13

14         VIDEO DEPOSITION OF DR. RALPH D. SCOTT

15      Held on Tuesday, January 9, 2018, at 10:13 a.m., in the

16  offices of Bridgforth & Buntin, PLLC, 5293 Getwell Road,

17  Southaven, Mississippi, at the instance of the Defendant, UPS

18  Ground Freight, Inc., a/k/a United Parcel Service

19

20  Appearances Noted Herein

21

22  Reported by:  Karen C. Popernik, MS CCR 1276, TN LCR 469

23

24

25  Huseby File No. 189006
```

Exhibit 2

1  APPEARANCES:

2  REPRESENTING THE PLAINTIFFS:

3      TAYLOR BUNTIN, ESQUIRE

4      Bridgforth & Buntin, PLLC

5      5293 Getwell Road

6      Southaven, Mississippi  38672

7      662.393.4450

8      Taylor@bridgforthbuntin.com

9

10 REPRESENTING THE DEFENDANT, UPS GROUND FREIGHT, INC., A/K/A

11 UNITED PARCEL SERVICE:

12     RONNA D. KINSELLA, ESQUIRE

13     Glassman, Wyatt, Tuttle & Cox, P.C.

14     26 North Second Street

15     Memphis, Tennessee  38103

16     901.527.4673

17     Rkinsella@gwtclaw.com

18

19

20

21

22

23

24

25

Page 22

1  material that did not impact my opinion, which was why it was
2  not attached to my report as an exhibit.
3      Q.  Okay.  So the W-2s were not attached because they
4  didn't really affect your opinion.
5      A.  That's correct.
6      Q.  Okay.  All right.  I'm going to mark the W-2s, then,
7  as the collective exhibit.  That will be Exhibit I.
8              (2015 AND 2016 W-2 INFORMATION MARKED AS
9              EXHIBIT I.)
10     Q.  Okay.  All right.  I just want to run through these
11 briefly.  I don't know that I'm going to mark all of these as
12 exhibits.
13             In your file, looks like there is a letter
14 enclosing documents that were received from Rust College.  Is
15 that correct?
16     A.  Yes.
17     Q.  And who is that letter from?
18     A.  Taylor Buntin, Stewart Matthews and -- well -- and
19 Robert Cox?  Oh.  I'm sorry.  Let's see.  Maybe James Simpson?
20     Q.  Okay.  And so there's no actual documents attached to
21 that letter.  Correct?
22     A.  I think this -- and there are not.  I think probably
23 this is a cover letter, though, that ultimately was associated
24 with the various transcripts that I received.
25     Q.  Okay.

Page 23

1      A.  And you know that since the Plaintiff's counsel
2  dumped on you the -- the -- the whole set of documents for this
3  case that I actually received all the pleadings.
4      Q.  Right.
5      A.  And everything that I might or might not have
6  possibly been interested in.
7      Q.  Okay.
8      A.  So this is just one of those documents.
9      Q.  Okay.
10     A.  I think I printed it as being indicative that -- that
11 basically Rust did make a transmission of documents, and I
12 think the transcripts are contained in there later, too.
13     Q.  Okay.
14     A.  Looks to me like this is a cover letter for those
15 transcripts.
16     Q.  And this may short circuit a little bit, but in going
17 to what you actually used and relied upon in support of the
18 opinions contained in your report, the documents like this and
19 the ones that you said -- and I'm going to use your term so
20 don't -- I don't want Plaintiff's counsel to get mad at me --
21 that Plaintiff's counsel dumped on us, those documents, if they
22 weren't actually included in your report, is it safe for me to
23 assume that you did not rely upon those documents in support of
24 your opinions?
25     A.  Yeah.  Well, let me be careful with one thing there

Page 24

1  with respect to the Rust documents that have all the
2  transcripts.  There is a time dimension as to when I actually
3  started my computations.  And if you will look at my tables --
4  okay --
5      Q.  The ones attached to the report?
6      A.  These are attached.  Yes.  This is part of Exhibit A.
7  You can see that I didn't run any earning capacity for
8  Scenario 2 and -- (reviews.)  I didn't run any computations for
9  2017 and '18 for Scenario 1, which is concerned with some
10 college so that assumes she would have been in college at least
11 another year, plus the past period that I didn't consider.  And
12 then for Scenario 2, which is actually Table 2, actually
13 allowed another two years before I assumed that she would have
14 finished college.
15             So those, at least, have some significance in
16 that I was able to tell from those transcripts that she was
17 somewhere between her first and second year in terms of credits
18 completed, which then allowed another passage of time before I
19 started running my earning capacity computations.
20     Q.  Okay.
21     A.  I didn't feel like it was anything that had to be
22 cited and attached, but it did enter in in that manner.
23     Q.  Okay.
24     A.  And I think my narrative basically makes it clear as
25 to when I actually started each set of computations.

Page 25

1      Q.  Okay.  All right.
2      A.  I hope that's not confusing.
3      Q.  No.  I understand perfectly.
4              All right.  So, then, going back to your file
5  materials again, it looks like there are -- and I'm not going
6  to go into all of these, but there is a series of media
7  articles or media blogs about the accident.  Correct?
8      A.  Yes.
9      Q.  Okay.  Let me get to the bottom of these here.  And
10 were these documents that you pulled or were these documents
11 that were provided to you by the Plaintiff?
12     A.  So -- so -- they were provided by the Plaintiff.
13     Q.  Okay.
14     A.  They were included in those drop box items that we'll
15 continue to say were dumped because it was a bunch of documents
16 dumped on me as well.  As I started wading through those
17 documents preliminarily, I printed out some things just that I
18 thought might be useful to me at some point.  And there is some
19 factual information in those newspaper accounts that I thought
20 could be useful.  And possibly I pulled some dates out of
21 there.
22     Q.  Okay.  You mentioned some -- that you -- okay.  Let
23 me back up.  That was a bad start to a question.  I apologize.
24 I think I heard you just say that you pulled some factual
25 information out of these articles that you thought might be

**Page 26**

1  useful to you in your report. Is that --
2   A.  Somewhere I got date of birth, date of death, and it
3  may have been in those articles. Alternatively, Mr. Peel may
4  have given that to me.
5   Q.  Okay.
6   A.  But those are parameters of computation that factor
7  into my analysis.
8   Q.  Okay. Specifically as it relates to these articles,
9  though, that you pulled for me for today, is there any -- and
10 I'll let you -- by all means, please look at them. Is there
11 anything specific in those articles that you say you've relied
12 upon or that you've used or that had some impact on your report
13 and your analysis in this case?
14  A.  Other than the possible dates that I pulled out of
15 these or could have pulled out of these, I don't think there's
16 anything else.
17  Q.  Okay. Well, then, we'll skip over the rest of that.
18  A.  It's factual data, but in terms of my opinion,
19 obviously, those facts are --
20  Q.  Okay.
21  A.  -- assumed into my opinion.
22  Q.  Okay. And then, I think, this was -- the next set of
23 documents looks to be those documents from Rust College that we
24 talked about. Looks like Hinds Community College, Northwest
25 Mississippi Community College transcript. These are in here.

**Page 27**

1  Correct?
2   A.  Yes.
3   Q.  Okay.
4   A.  And there actually is a Rust application that may --
5  that may be where I got the dates.
6   Q.  Okay.
7   A.  I'm not sure where I got the dates.
8   Q.  So we have some of the transcripts, it looks like.
9       Okay. All right. From these specific documents
10 that you pulled out for Rust College, is that -- and correct me
11 if I'm wrong. Is that all the documents that you received from
12 the Plaintiff related to the Plaintiff's collegiate history?
13  A.  Yes.
14  Q.  Okay. And were those documents relied upon by you in
15 support of your opinions in this case --
16  A.  Only --
17  Q.  -- beyond what we've talked about?
18  A.  Yeah. I don't think beyond what we've already talked
19 about.
20  Q.  Okay. All right. I am going to go ahead and make --
21 since you pulled these out for me, I'm going to go ahead and
22 make these documents with the cover letter from Rust College as
23 the next collective exhibit. It looks like it will be
24 collective Exhibit J.
25      (COLLEGE TRANSCRIPTS MARKED AS EXHIBIT J.)

**Page 28**

1   Q.  And, then, Dr. Scott, it looks like the last thing in
2  here appears to be a copy of what purports to be the First
3  Amended Complaint in this case. Is that correct?
4   A.  Yes.
5   Q.  And you do understand that that First Amended
6  Complaint is not actually part of this case. Correct?
7   A.  I don't.
8   Q.  Okay. Did you rely upon that in any way since it's
9  part of your file materials?
10  A.  Not really. I think I probably printed this out just
11 with the thought that it might contain some underlying factual
12 information that I would use.
13  Q.  Okay. Is there any specific factual information that
14 you recall reviewing in this First Amended Complaint -- and,
15 again, I'm more than happy to let you look at it -- that you
16 actually used in either creating or supporting your opinions in
17 this case?
18  A.  (Reviews.) So I think some of the factual things
19 would have factored in. For example, here's the date of death
20 that I definitely factored into my analysis. I can't tell you
21 if I got it from here or the newspaper. I had to have that
22 information so -- it is contained in the Complaint. (Reviews.)
23 I don't think there's anything else in there.
24  Q.  Okay. All right. Okay. I'm going to give you what
25 is left right now of your file materials back.

**Page 29**

1   A.  Okay.
2   Q.  And let me separate this out.
3       Okay. Dr. Scott, I'm going to hand you the
4  deposition notice in this case.
5       BY MS. KINSELLA: And, Mr. Buntin, if you would
6  like to take a look at it --
7       BY MR. BUNTIN: I've got one.
8       BY MS. KINSELLA: Okay.
9   Q.  Have you seen this Notice of Deposition before?
10  A.  I have.
11  Q.  Okay. If you flip over to where it looks like Page
12 -- really the start of Page 4, there's an Exhibit A --
13 unfortunately, we are back to letters again --
14  A.  Yes.
15  Q.  -- attached to this deposition notice.
16  A.  Yeah.
17  Q.  Did you review this Exhibit A before your deposition
18 today?
19  A.  I really did not spend much time with this, primarily
20 because I thought that I had already provided all of the
21 required Rule 26 stuff, plus I knew I was going to bring my
22 whole file with me.
23  Q.  Okay. All right. I want to run through these with
24 you just real fast and make sure --
25  A.  Sure.

```
 1              CERTIFICATE OF COURT REPORTER
 2        I, KAREN CARNELL POPERNIK, MS CCR 1276,
 3   TN LCR 469, Notary Public commissioned by the State of
 4   Mississippi, do hereby certify that the foregoing pages, and
 5   including this page, contain a true and correct transcript of
 6   the testimony of the witness, DR. RALPH D. SCOTT, as taken by
 7   me at the time and place heretofore stated, and later reduced
 8   to typewritten form to the best of my skill and ability; that I
 9   placed the witness under oath to truthfully answer all
10   questions in this matter by the authority vested in me by the
11   State of Mississippi and the State of Tennessee; that the
12   signature of the witness was expressly waived; and that I am
13   not in the employ of, or related to, any counsel or party in
14   this matter, and have no interest, monetary or otherwise, in
15   the final outcome of the proceeding.
16        Witness my signature and seal on this the 9th day of
17   January, 2018.
18   [signature]
19   _____
20   KAREN CARNELL POPERNIK,
21   MS CCR 1276, TN LCR 469
22   My Commission Expires:  3/5/20
23
24
25
```