IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

_____

| | |
|---|---|
| **LOLITA PENNINGTON, INDIVIDUALLY** ) | |
| **AND AS REPRESENTATIVE OF THE** ) | |
| **ESTATE AND WRONGFUL DEATH** ) | |
| **BENEFICIARIES OF ANDRIANA HALL,** ) | Civil Action No.:3:16cv248-NBB-JMV |
| ) | |
| *Plaintiffs,* ) | |
| ) | **JURY DEMANDED** |
| **vs.** ) | |
| ) | |
| **SHARANJIT PARMAR,** ) | |
| **PARMAR TRUCKLINES,** ) | |
| **UPS GROUND FREIGHT INC.** ) | |
| **a/k/a UNITED PARCEL SERVICE,** ) | |
| ) | |
| *Defendants.* ) | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT UPS GROUND FREIGHT, INC.'S *DAUBERT* MOTION TO EXCLUDE
PLAINTIFF'S PROPOSED EXPERT DR. RALPH D. SCOTT**
_____

Defendant UPS Ground Freight, Inc. ("UPS"), by and through its counsel of record, Glassman, Wyatt, Tuttle & Cox, P.C., respectfully files this Memorandum of Law in further Support of its Motion to Exclude the proposed expert report, opinions and testimony of Plaintiff's proffered expert, Dr. Ralph D. Scott pursuant to Rule 702 of the Federal Rules of Civil Procedure and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In support of this Motion, UPS would show as follows:

**INTRODUCTION**

The underlying lawsuit stems from a multi-vehicle accident on April 14, 2016. On that date, around 10:30 in the evening, the decedent, Andriana Hall ("Hall"), was speeding in her 2003 Chevrolet Impala, headed westbound on US 78 near Olive Branch, Mississippi with no

seatbelt on, marijuana still in her system, no headlights on, and with two bald rear tires on her car in heavy rain. The highway in this area was unlit. Hall lost control of her vehicle and began to spin. She crossed the westbound lane of travel, spun into the median, struck the cable barrier, and then spun back into the path of westbound traffic, striking and ultimately causing her car to go partially under a tractor trailer driven by Defendant Sharanjit Parmar, before the Impala spun again and went back across the left travel lane, eventually coming to a stop perpendicular to the roadway with the passenger side of the Impala facing oncoming westbound traffic on US 78. UPS driver James Capwell, also traveling westbound on US 78, was driving behind a cattle truck and had moved into the left travel lane to allow a vehicle merging onto the highway to enter on the right. As Capwell approached the unlit area where Hall's Impala was blocking the travel lane, the cattle truck, which had been obstructing Capwell's view of the Impala, swerved to the left. When Capwell was able to see the Impala, he slammed on his breaks, but was unable to avoid striking the Impala. Hall was later pronounced dead on the scene.

## LAW AND ARGUMENT

I. **RULE 702 AND THE *DAUBERT* STANDARD**

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to [*11] the facts of the case.

Fed. R. Evid. 702. Before allowing a witness to testify as an expert, a court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (quoting FED. R.

EVID. 702). With its holding in *Daubert,* the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). Specifically, *Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 988-89 (5th Cir. 1997).

*Daubert* gives to the trial court a "non-exclusive checklist" for use in determining the reliability of expert testimony. These factors include: (1) whether the expert's technique or theory has been tested; (2) whether the technique or theory has been subjected to peer-review and publication; (3) the known or potential rate of error applicable to the technique or theory; (4) the existence of standards and controls applicable to the technique or theory; and (5) whether the technique or theory is generally accepted in the scientific community. *Daubert,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Generally speaking, the trial court is charged with ensuring that the proposed testimony and opinions are supported by "good grounds." *Id.* at 590.

A court's gatekeeping function also involves ensuring that "the expert uses reliable methods to reach his opinions," and that those opinions are "relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether that reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 589, 113 S. Ct. 2786) It is the burden of the party offering the proposed expert opinions to demonstrate to the court that such opinions are based upon

accepted methodology and reliable data. *Id.* at 591, n. 10; *see also Moore v. Ashland Chemical, Inc.,* 151 F.3d 269, 276 (5th Cir. 1998).

II. **THE OPINIONS OF DR. SCOTT ARE NOT THE RESULT OF ANY DISCLOSED METHODOLOGY OR RELIABLE METHODS, AND INSTEAD REST UPON UNSUPPORTED ASSUMPTIONS AND SCOTT'S IGNORING OF AVAILABLE CASE FACTS WITHOUT EXPLANATION.**

At the outset, UPS notes that it is not challenging Dr. Scott's qualifications in this matter. Rather, for purposes of this Motion, it is UPS's position that Dr. Scott's opinions, premised upon three wholly unsupported assumptions which ignore available and pertinent case facts without any explanation or justification by Dr. Scott, call into question the purported "methodology" used to reach his opinions in this case. Additionally, those same unsupported assumptions and failure to account for specific, available facts pertinent to Hall's education, past wages, past financial history, and potential earnings in his opinions mean that his opinions will not assist the trier of fact in this matter.

Dr. Scott's opinions in this matter start with "[h]ad she remained alive, Hall *could* have been expected to generate income flows over her productive work life." (Ex. 1, p. 1)(emphasis added). He then leaps to the next assumption, again with no factual support or basis referenced whatsoever, that Hall would have, within a year after the accident, suddenly begun making $24,046.00, $36,482.00, or $49,630,00, depending on which of the three (3) "scenarios" he offers that one chooses. *Id.* at p. 2. Having no actual facts, documents, or data on which to rely upon, he then makes his third assumption, which is that Hall would have had a "personal consumption/maintenance percentage" of 30.0%, which Scott claims to arrive at based upon an "approximately equal" percentage "to the average consumption percentage of single females, married females, and married females with two children" who fall within one of the three (3)

scenarios he randomly selected earlier.[1] *Id.* Scott then summarily concludes that "based on the assumptions above," Hall had "a projected future value of projected income in the range of $608,478.64 to $1,104,839.76." *Id.* at p. 3.

Just as telling as what is in his report is what is <u>not</u> – namely, any fact, document, or item of evidence Dr. Scott can point to in order to actually tie his assumptions in with the facts of this case. (*See generally*, Ex. 1.)  As noted previously by UPS in its prior Motion to Strike Plaintiff's Expert Disclosures and Motion to Compel Discovery, during the discovery process, UPS made numerous formal requests for information and documents to support *any* claim of purported loss on the part of Hall, including *anything* concerning the alleged loss of income, loss of future earning capacity, and other similar claims.  Plaintiff asserted that she either did not know of or could not obtain most of those items.  The fact that despite UPS's request for banking records, credit card expenditures, tax records, governmental assistance records, and other similar documents which might lend *any* objective or verifiable support to the Plaintiff's claims has gone almost entirely unanswered is telling, as is the fact that nowhere in Scott's entire report does he reference or even mention such information and the need for same.

Even what little documents and information UPS *was* able to obtain from the Plaintiff on these issues has been wholly ignored by Dr. Scott in his report and opinions in this matter. For example, UPS was able to obtain Hall's W-2s for a few years leading up to the accident. However, Dr. Scott admitted during his deposition that this evidence of Hall's actual earnings prior to her death played no role whatsoever in formulating his opinions in this case about Hall's alleged lost earning potential. (*See*. Ex. 2, p. 22:3-5.) Even though he had Hall's college transcripts, showing that for the less than two (2) years she was actually enrolled in school her

---

[1] According to the limited information provided by the Plaintiff to date, Hall was neither married nor had any children at the time of her death, meaning at least 2/3 of the data Scott proposes to rely upon for this assumption is likewise irrelevant.

gpa was only 1.62, and her grades were comprised largely of "Ds", "Fs" and "withdrawals," Dr. Scott again admits he did not rely on these documents to assess his assumptions concerning Hall's potential lost earnings beyond simply concluding "that she was somewhere between her first and second year in terms of credits completed. (*See* Ex. 2, pp. 23:16-27:19; Ex. 3.) Dr. Scott paid no attention to Hall's prior work history, prior earnings, or other such available, factual information in reaching his unsupported assumptions in this case. (*See e.g.,* Exs. 1-3.)

While Dr. Scott references certain articles, Mississippi case law, and U.S. Census Bureau publications in his report, the bottom line is that he offers no explanation of what methodology, if any, he used to arrive at each of his three proffered assumptions/opinions *in light of the specific facts of this case*, nor does he provide **any** explanation or support for why the specific assumptions he made in this case to reach his opinion are appropriately applied in this case. Simply put, Dr. Scott's failure to account for any of the specific factual information pertinent to this case – Hall's scholastic records, her past employment/wage history, her prior financial information, etc. – coupled with his failure to explain – at all – the grounds/methodology by which he purportedly reached his opinion in this case that the net cash value of Hall's life is "in the range of $608,478.63 to $1,104,839.76" leads to only one conclusion, namely, that Dr. Scott's "guesses" referenced in his report are "guesses" and that therefore his opinions are not and cannot be based upon the requisite "good grounds" called for by *Daubert.* Such assumptions, not tied to or otherwise relevant to the actual facts of this case, cannot meet the level of reliability required by Rule 702 and will not assist the trier of fact, who can just as easily make unsupported "assumptions" on their own.

**WHEREFORE, PREMISES CONSIDERED,** for the reasons set forth herein and in the Memorandum in support of this Motion, UPS requests that the Court enter an Order

excluding the proposed report, opinions and expert testimony of Dr. Scott, and further requests all additional and further relief the Court deems appropriate.

Respectfully submitted, this the 2nd day of February, 2018.

*GLASSMAN, WYATT, TUTTLE & COX, P.C.*

**/s/ Robert A. Cox**
**ROBERT A. COX, ESQUIRE (MSB# 104711)**
**RONNA D. KINSELLA, ESQUIRE (MSB# 101884)**
26 N. Second Street
Memphis, Tennessee 38103
(901) 527-4673 – Telephone
(901) 527-0940 – Facsimile
rcox@gwtclaw.com
rkinsella@gwtclaw.com
*Our File No. 16-204*

Jonathan R. Friedman (*Pro hac vice*)
P. Shane O'Neill (*Pro hac vice*)
WEINBERG WHEELER HUDGINS GUNN & DIAL, LLC
3344 Peachtree Road, NE, Suite 2400
Atlanta, GA 30326
404-876-2700(tel)
jfriedman@wwhgd.com
soneill@wwhgd.com
*Attorneys for Defendant UPS Ground Freight, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a Notice of Service concerning the foregoing pleading was filed via the Court's CM/ECF system, which will electronically transmit a copy of said pleading to all counsel of record. In addition, a copy of this pleading has been forwarded to counsel below via electronic mail:

Taylor Buntin, Esq. (taylor@bridgforthbuntin.com)
BRIDGFORTH & BUNTIN, PLLC
5293 Getwell Road
Southaven, MS 38672

E. Todd Tracy, Esq. (ttracy@vehiclesafetyfirm.com)
Stewart D. Matthews, Esq. (smatthews@vehiclesafetyfirm.com)
Andrew G. Counts, Esq. (acounts@vehiclesafetyfirm.com)
The Tracy Law Firm
4701 Bengal Street
Dallas, Texas 75235

**This the 2nd day of February, 2018.**

                                          **/s/ Robert A. Cox**
                                          **ROBERT A. COX, ESQUIRE**